Whenever you're ready, counsel. And it's parlatory. Good morning. May it please the court. My name is Tim Parlatory and I represent the appellant Daniel Dvorkin. In our briefs, we outlined basically four different areas. I want to concentrate really on the first three today, that the evidence was insufficient, that the renunciation defense should have been granted on the Rule 29, and that the district court improperly restricted the cross-examination of the cooperating witness. With regard to the renunciation, I just want to very briefly address that because in the government's opposition there seemed to be a little bit of confusion because this was not something that was presented to the jury and it is something that certainly would be more fully explored in a 2255 later on. The sole purpose of why this is being brought before the court on the direct appeal is with regard to the Rule 29 motion where the court had all of the evidence that was presented at trial about the renunciation and that the court certainly did have the discretion at that time to grant the Rule 29 motion on the renunciation. So let me just be clear. Sure. So does the renunciation defense imply a defendant once had the necessary intent? I was just wondering how it affects your argument on the 1958 counts that he never had any intent. I mean, so if you could comment on that. It is an alternative theory. Essentially, Mr. Dvorkin is contesting whether he ever had the requisite intent to begin with. He finds that he did have the requisite intent. Certainly the fact that he renounced that intent and prevented the crime from actually occurring should render the conviction overturned. So it's not a claim of instructional error. You're saying he's entitled to an acquittal based on renunciation. An acquittal or a retrial where that can be presented to a jury. Well, the latter would be a claim of instructional error, and you said you're not making that. That's for a 2255? Correct. Because it was waived? That is for a 2255 because there was a brief discussion about it on the record, which the transcript reads almost like an ex parte proceeding where the prosecution and the judge are opining as to the defense's theory on renunciation, and the defense didn't really add anything to it. But to explain that is something I would really need to expand the record. That's why I'm going to hold that to a 2255. Well, and there's a really plausible, if not strong, tactical argument to forego it in this situation, right? I mean, to make that kind of either-or defense that I didn't intend, but if I intended, I renounced? I mean, that's really tricky. It is. So as a basis for a 2255, it's a little dubious. But I understand you're reserving that. So if your argument is that he renounced as a matter of law, that this record establishes the defense as a matter of law, that's a pretty big stretch. So you might want to go to the other one. I am. I wanted to address that briefly. Now, as to the district court improperly restricting the cross-examination of Robert Davis, who is the cooperating witness, here the cooperating witness has previously been engaged in lawsuits and also had been sanctioned by the Secretary of State, prohibited from selling securities, based on the sale of unregistered securities. This was something that the defense wanted to cross-examine him on, and the district court disallowed it. The district court argued or ruled that to ask him any questions about any lawsuits or any findings by the Secretary of State would constitute extrinsic evidence. But that is a complete, it's a mischaracterization of what extrinsic evidence is under 608, because extrinsic evidence is a physical document, another piece of evidence. The defense should have been allowed to cross-examine the witness, ask him about the finding of the Secretary of State. There wouldn't have been a hearsay issue under 803-8. But where the extrinsic evidence rule draws that line is if defense counsel ever wanted to try and approach and hand him the actual finding from the Secretary of State. The district court moved the line way too far by saying you're not even allowed to ask him questions about the Secretary of State and then improperly characterize that as extrinsic evidence. Same with the prior lawsuits. What were you allowed to ask? The defense counsel at trial was permitted to ask some questions just about the underlying conduct, but not about any punishment or any other proceedings that the witness had had as a result of the underlying conduct. It essentially gave the witness the green light to deny any wrongdoing without the fear of being impeached or having any follow-up questions whatsoever on the issue. So in essence, even though, as the government argued in their response, there were questions that defense counsel could have asked on cross-examination, the prejudicial effect of this ruling restricted the cross-examination much further than that by chilling the ability to ask these questions, knowing that there is no way to continue to press the witness on these issues. So there wasn't even an effort to ask him about specific conduct? There was a brief effort made. And exactly what was he asked? The defense counsel did ask whether he had been barred from selling securities, and it was immediately shut down. That was, but I mean I'm talking about prior to that. Prior to that, there were some brief questions about it. It didn't really get nearly as deep as it probably should have. And so that's what I'm saying, exactly what were the precise questions put to him? The precise questions I don't have in front of me here. Because that has an impact, because if he was asked specifically about that conduct and then, for example, he denied it, then it seems to me it becomes a different issue perhaps for the district court to determine whether or not that extrinsic evidence could be used. In other words, if he denied it, if specific questions were put to him, he denies it, then you're in a much better position to get the district court to change the ruling or consider changing the ruling. But it didn't even sound to me like, and you can't give me those questions, it even got teed up for that. It did not get very far, Judge. And the argument is because it was. . . I understand the argument. You're saying because it was barred because of extrinsic evidence, counsel just assumed that there would be a denial, I guess, and so didn't even put the question to him. But that to me is not a good assumption. Well. I mean, because the court didn't bar him from asking about the underlying conduct. It was just the consequence of the underlying conduct, the order, correct? Correct. So, yes, certainly my argument is, as it is in the papers, that the cross-examination could have and should have gone much further and certainly the prejudicial effect of this ruling, by restricting the ability to ask follow-on questions, would have chilled the ability to ask even the introductory questions. And also, especially given the fact that when he started and he did ask that one question and was admonished in the middle of trial, that it chills the defense's ability to really go back after the issue. But going to the. . . But just so I'm perfectly clear, the court did allow questions about and said, articulated, said, that it would permit questions about these fraudulent schemes. Yes. Okay. All right. Going to the main issue, though, that the evidence was insufficient to show that my client had the requisite criminal intent here. This is a fairly fact-intensive analysis, but also we are relying on the Court's prior ruling in U.S. v. Rahman. What we have here is a defendant who unquestionably said some things he shouldn't have said. I recognize that the tapes certainly look bad, and his initial statements to Mr. Bevis about trying to, you know, potentially meet with a hit man. The problem is that by upholding the conviction, this is essentially a thought crime where he had an imprudent desire, which he never acted on. They had discussions about meeting with a hit man. In fact, the 418 tape, which is in the government's appendix presented to the Court, the whole discussion is about trying to arrange a meeting, not about the actual hiring. And, in fact, when everything's moved past that to actual hiring, that's when he waffled and he tried to get away from it. It is exactly the same as what happened in Rahman, where the defendant in Rahman made several, as this Court described them, reprehensible statements, but then when things started to get down to business of actually hiring a hit man, he also began to equivocate and back out. I see the light is on for the rebuttal time. Would you like to save some time? I would, Your Honor. All right. Unless there's any questions you want me to answer right now. No. Mr. Schneider. Good morning, Your Honor, and may it please the Court. My name is Mark Schneider and I represent the United States. With respect to the sufficiency claim, Your Honor, the jury's verdict as to both the solicitation count and the murder-for-hire count was supported by ample evidence that established that the defendant's solicitation and effort to have his creditor killed was not idle chatter or mere fantasy. And that evidence included not only the defendant's statement on August 6th that he wanted the creditor to stop breathing and was prepared to pay up to $50,000 to accomplish that goal, but numerous other evidence that showed that his intent here was serious, including the fact that he had tasked his assistant on April 2nd, four days before that meeting, to track down the photograph, the synagogue, the address of the victim, the premeditation he showed in setting up the meeting with Mr. Bevis, the logistical discussions that he had, including his intent to be outside of the country when the hit happened, his offer to arrange for the hitman to travel from Florida to Texas using something other than commercial aircraft, his persistence in these conversations, most of which were recorded over the course of a month, the lack of surprise that he showed when ultimately confronted by the FBI, the consciousness of guilt he manifested when he counseled Mr. Bevis to lie to the FBI about the nature of their meetings. And this all happened in the context of parallel civil litigation in DuPage County in which the defendant is seeking an appeal bond to prevent the enforcement of a judgment in excess of $8 million against him. Now, one of the things in the defendant's reply brief indicated that the FBI never found any cash that he had been setting aside in one of those conversations. He said he was setting aside money to pay for the hit. Is that right, the FBI never? I don't know of any evidence in the record that cash had been recovered. There was evidence that Mr. Bevis said that in that initial conversation, the defendant said he had untraceable cash and showed Mr. Bevis a wad of cash at that point. And then obviously there are the subsequent conversations in which Mr. Bevis offers that the amount that the hitman will do this for is $80,000. And there are these negotiations afterwards to try to negotiate that price down. And then in terms of the second killer talk, there was no – the FBI investigated that. They didn't find any evidence of a second killer. Doesn't that support the defense's theory that he was bluffing when he said he wanted Meyer killed at least as time moved on? No, that's not true, Your Honor. There was, in fact, evidence of a second killer. The district court acknowledged that in denying the Rule 29 motion at page 4 of its order. The evidence included, first of all, the defendant's statements that he had another killer lined up. But also, after he's confronted by the FBI, the FBI sees that his immediate call is to someone else. He had, in one of the recorded calls on May 7, said that the person who was assisting him with this hit was involved with him in other ways. So after he's confronted by the FBI, he makes a phone call to someone else immediately. The FBI then follows Mr. Dvorkin to that meeting. At that meeting, there are surveillance photographs taken. The FBI then confronts the participant at this meeting who denies having the meeting with Mr. Dvorkin. After he's confronted with the photograph, he admits the meeting. He denies his involvement with the hit. He then talks to a lawyer, refuses to answer his questions, is subpoenaed to the grand jury, and evokes the Fifth Amendment. So there was, in fact, both surveillance and phone calls that provide circumstantial evidence corroborating the defendant's statement that there was, in fact, another killer. Now, that was not introduced at trial based on the various discussions that were had, but the defense suggested both in the opening and in their closing that there wasn't, in fact, another killer. So they had really the benefit of being able to argue that there wasn't another one without the government introducing the circumstantial evidence that, in fact, there was someone else out there. And it was certainly our theory that there was another person out there, though that was not the theory on which the government relied for the solicitation conviction on the first count. With respect to the 608B issue, we would acknowledge that there is certainly some tension with the district court's discussion of what is extrinsic evidence with this court's decision in Dawson. The Dawson case was never presented to the district court, and, in fact, the defendant's original theory of admissibility of this evidence was under Rule 404B. So the district court then explained that the proper lens to view this is under 608B. And if you look at Rule 608B, and particularly if you look at the 2003 note to 608B, that note makes clear that this would be extrinsic evidence. Now, that's not what this court held in Dawson. But what Dawson and Holt make clear is that a district court still has broad discretion in this area to strike this balance between allowing impeachment that truly goes to something that bears upon character for truthfulness without getting into a sideshow and many trials and confusion of the jury. And as the district court did here, really a roadmap was drawn for defense counsel in terms of how they could do this cross-examination of Mr. Beavis. And as the defense lawyer today conceded, they did very little with respect to that. But I think what's most important here is that if you look at the Secretary of State record, the admission or the denial of the admission of which or questions about which is challenged, and we've included that in our appendix at page 97, there is no finding in the Secretary of State order as to untruthfulness or as to fraudulent conduct. What the Secretary of State order finds is that he sold unregistered securities and it barred him from offering or selling securities in the future. And Mr. Beavis was asked those questions, and he admitted in his cross-examination that he had sold unregistered securities. So aside from the disciplinary context or the suspension order that the Secretary of State entered, there were no findings in the Secretary of State order that the witness did not admit during his cross-examination. So the specific instances of conduct actually came in? Yes. What did not come in was the fact that he had been barred from the securities business. But the fact that he had sold unregistered securities did come in. Right.  In other words, the fact of the Secretary of State's order is not a specific instance of conduct within the meaning of Rule 608. Correct. And it's not, most importantly, probative of character for truthfulness. And the district court in its written order on the motions in limine, I think makes that clear, and this is in the government appendix at 121, that the questioning must be targeted to the underlying conduct that is itself evidence of character for truthfulness. So even if this is not extrinsic evidence, as that is defined by Dawson, the district court was really seized of the issue of narrowing the examination and the testimony to those facts that, in fact, related to truthfulness, which was the underlying conduct that he was asked about and, as I indicated, admitted having sold unregistered securities. Counsel, you said there was a tension between the comments to Section 608B and our case law. I'm not too sure that I caught the point you were trying to make there. Precisely what is the... Well, I mean, Dawson suggests that asking questions is not extrinsic evidence. Yeah. And I think the court thought that asking questions about what the Secretary of State did would constitute extrinsic evidence, and that's certainly how it is defined in the 2003 note to Rule 608B. In Holt, the court said that Dawson is inconsistent with that note, but both cases emphasize that a district court retains broad discretion in this area to control the admission of this type of evidence. And I think if you look at what really motivated the district court here, it was this concern with making sure that that evidence, which was admitted, really bared on the question of character for truthfulness and not peripheral matters. The other piece of evidence was this civil lawsuit that had been filed. But the civil lawsuit was still in litigation. It was clearly hearsay, and its probative value in terms of an unsupported complaint filed in litigation by a witness who wasn't present at trial was exceedingly limited, and its exclusion would certainly fall within district court's discretion. But the court also allowed him to inquire into that to a certain extent. To a certain extent. He was absolutely allowed to inquire into whether Mr. Beavisley had falsely represented that these securities were registered, whether there were, in fact, stocks in these companies that he had sold. And that line of questioning really was not pursued. Well, he was also looking now again and again at your appendix at 121. The court did permit some inquiry with respect to the DuPage County civil complaint. That's right. And he said that Dvorkin could cross-examine Mr. Beavis about whether he ever sold stock to others, whether the stock was registered, and this is the key question on the character of truthfulness, whether the stock even existed. And then when you look at the next paragraph of the court's order, even in terms of that other lawsuit, the court permitted some inquiry.  To the facts underlying the lawsuit. And I would say, too, Your Honor, that even if there were an error with respect to this evidentiary issue, the error was clearly harmless. First, because Mr. Beavis admitted that he had sold unregistered securities. Second, because it was not relevant to the question of his truthfulness. But in addition, the jury had a very robust set of evidence from which it could judge the credibility of Mr. Beavis. It knew, for example, that he was a gun shop owner. And there was evidence that he was seeking to sell guns in the future to the police and might be seeking to curry favor for that reason. There was evidence that he was a process server who used to use the defense word sneaking methods in serving process. One of his business partners, Mr. DelSanti, testified about his opinion of the defense and truthfulness. There was testimony that he hadn't filed taxes, that he was testifying for that reason under a grant of immunity, that he had solicited from the FBI evidence in the case so that he could sue Mr. Dvorkin. So the jury had a very full picture of Mr. Beavis and being able to assess his testimony. But at the end of the day, this wasn't a case about the credibility of Mr. Beavis, because the key interactions that Mr. Beavis had with the defendant were either audio recorded or video recorded. And to the extent that they weren't, such as the April 6th meeting, they were corroborated in other ways. For example, the April 6th meeting, Mr. Beavis had presented, and this was introduced at trial, a copy of the judgment against Mr. Dvorkin and a copy of the LinkedIn profile that Mr. Dvorkin's assistant had printed out with the photograph of the target. And Mr. Dvorkin's assistant, Ellie Farkas, testified at trial that it was her handwriting across the top. So his testimony was extensively corroborated throughout the case. Finally, with respect to the renunciation issue, I'm not aware of any case in which a district court has granted a Rule 29 motion based on an affirmative defense that the defendant declined to present or declined to pursue at trial. But even if it were proper to raise an affirmative defense after the fact, either at a Rule 29 motion or for the first time in appeal, it certainly wouldn't apply here. At the Rule 29 stage, the date that they relied upon in the Rule 29 briefing was the May 11 conversation, and that was several days after the FBI had confronted him. So at that point, any renunciation was clearly not voluntary. And with respect to the May 7 call, which is the more full discussion of the other Avenue killer, there are at least several incidents in that in which he is still saying that this is merely a postponement. He says, if nothing happens by Friday afternoon after next week, I will call you for another appointment. That is to negotiate the price with the killer and we will go. But the two things I'd want, one is the price and I don't want 50 percent down. He says later, tell him I've got somebody in the 20s. Bevis says, all right, all right, I'll tell him 20. And Mr. Dvorkin says, yeah. He says, Mr. Bevis says later, he asked me if I was sure that you'd finalize the payments and I agreed. And Mr. Dvorkin then says, absolutely. So even at that point, while the second Avenue killer is out there, Mr. Dvorkin, the defendant here, is clearly engaged and has not renounced this. He's simply putting it on hold because he thinks he's found a better price. So for all these reasons, subject to any questions the court would have, we would ask that you affirm the judgment of the district court. Thank you, Mr. Schneider. How much time? Three minutes, counsel. Thank you. I'd like to start by just briefly addressing one issue that was raised about the existence of this second killer. The truth is that there was no evidence of a second killer. They followed him and saw him meet with a business partner who told them that it was totally innocent, agreed to take a polygraph. Actually, he met with two people. One took the polygraph. The other one agreed to take a polygraph. And then when his wife told him, who is an attorney, don't take a polygraph, take the fifth. You don't have to cooperate with them. He stopped talking to them. At that point, all investigation ceased, and they went into court and said, this is the second killer. The only evidence that they had of a second killer was that he met with them and that the guy later pled the fifth. So to argue that they had evidence of a second killer I think is a bit of a stretch. But going back to the sufficiency of the evidence to show his intent, what the government just argued is when he said that he wanted him to stop breathing. And then when he set up a meeting, was trying to set up a meeting with the killer, that this is all strongly corroborative. And yet if we look back at this court's ruling in Raman, strikingly similar, we have him saying, I'm going to let his kids live without a father. Put a bullet in his head as far as trying to locate him, giving somebody $5,000 to locate him and report back. When the person offers to set up a meeting with the hitman, Raman agrees. Not only does he agree, he actually meets with the hitman. So Raman takes it one step further than Dvorkin did. He was more explicit in his language, and he took it further to actually meet with the hitman. So by saying that these are the things that make it strong and corroborative doesn't mesh with this court's holding in Raman. Because ultimately if you look at the totality of all of these interactions, what Mr. Dvorkin is trying to do is no different than any one of us who are in a car dealership trying to get away from an aggressive salesman.  He says, I can get this car for half the price at the dealership across town. You make excuses and you try and get away from them. That's exactly what the evidence was showing that Mr. Dvorkin was doing here. And therefore, we argue that the evidence was insufficient to show the strongly corroborative requirement. It's important to note that the 373 statute, by including that extra language of under circumstances strongly corroborative of that intent, most statutes just say with intent that you do something. This statute says with intent and under the circumstances strongly corroborative of, then you do it. And I think that, I see my time is up, but I think that we need to give extra attention to the fact that the legislature did put that extra language in. And under these circumstances, I would ask that the court overturn the district court's decisions. Thank you, counsel. We'll take the case under advisement. Thank you. And call the fourth case.